503 So.2d 45 (1987)
Larry Joe VIRGIL
v.
AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, et al.
No. 86 CA 446.
Court of Appeal of Louisiana, Fifth Circuit.
January 12, 1987.
Edmond R. Eberle, New Orleans, for plaintiff-appellee.
Thomas L. Gaudry, Jr., Gretna, for defendants-appellants.
Before DUFRESNE, WICKER and GOTHARD, JJ.
GOTHARD, Judge.
This is an appeal from a worker's compensation claim filed on behalf of Larry Virgil against his employer, Scaffolding Rental and Erection Service, Inc. and its compensation insurer, American Guarantee and Liability Insurance Company, for an injury to his back sustained while lifting a heavy board in the performance of his work related duties on December 7, 1982.
The trial court rendered judgment on March 27, 1986, awarding plaintiff $153.00 per week for a period of 100 weeks, less $3,570.62 in past benefits. American appeals this judgment and urges that the trial judge erred in awarding the plaintiff a judgment for being temporarily totally disabled for 100 weeks. Virgil answers the appeal.
The evidence shows that on December 7, 1982, Virgil was in the employ of Scaffolding Rental and was working as a general laborer in its Kenner yard when he sustained a back injury while lifting some lumber. The primary issue is whether Virgil introduced sufficient evidence to prove a disability as a result of the December 7th accident, which would justify an award of 100 weeks of compensation benefits.
The record reflects that the only testimony was that of the plaintiff and his mother. As to medical evidence, we find only medical and hospital reports, together with depositions of several physicians.
Counsel for American argues that because all of the medical testimony is presented in the form of depositions, then all of the medical testimony should be reviewed on the basis of sufficiency and preponderance of the evidence instead of the manifest error rule. The manifest error rule does not apply on appeal, where the *46 trier of fact relies purely upon the written reports, records or depositions. We stand in the same position with the trier of fact to assess credibility and weigh the medical evidence, Dickerson v. Zurich American Insurance Company, 479 So.2d 571 (La. App. 1st Cir.1985) and Woodard v. George Cole Chevrolet, Inc., 444 So.2d 1367 (La. App. 2nd Cir., 1984).
Accordingly, we have carefully examined the medical evidence found in the record in light of the above standard.
The chronological sequence of Virgil's Medical history is as follows:
December 7, 1982  On the date of Virgil's injury he was seen and treated by Dr. Earl Alleman, a physician in Norco, Louisiana who took X-rays of his lumbosacral spine. Later on December 13th and 18th, he administered injections and had diagnosed Virgil's condition as being an acute strain of lumbar muscles. On December 20th Dr. Alleman referred Virgil to an orthopedist, Dr. V.J. Zeringue of LaPlace.
December 21, 1982  Dr. Zeringue's first examination of Virgil and reports a "tenderness lumbar musculature" as his diagnosis and immediately hospitalized Virgil at River Parish Medical Center for pelvic traction. Virgil remains hospitalized four days, until December 24th. The hospital's discharge summary notes indicates: "At the time of admission he was limping to the left with severe lumbar muscle spasms noted in the lumbar region ... he was placed in pelvic traction, sent to physical therapy for ultra sound and analgesic back massage. He improved progressively... he is to continue physical therapy on an outpatient basis."
December 30, 1982  Virgil visits Dr. Zeringue for a follow-up examination.
February 3, 1983  Virgil visits Dr. Zeringue and he recommends physical therapy, whirlpool, ultra sound, deep heat and electrical stimulation.
March 7, 1983  Visit to Dr. Zeringue, and he advises continued conservational treatment.
April 5, 1983  An EMG (nerve conduction) test is recommended by Dr. Zeringue.
April 11, 1983  Dr. R. Hugh Fleming administered the EMG test, which proved to fall within the normal range. That is there were no signs of nerve root pathology.
April 28, 1983  Dr. Zeringue advised Virgil to continue physical therapy.
May 19, 1983  Dr. Zeringue discharged Virgil and stated that he may go back to work. Dr. Zeringue's narrative report of May 20, 1983 states there were lumbar muscle spasms and his impression was a lumbosacral strain. When last seen, Dr. Zeringue notes that Virgil was complaining of intermittent discomfort in the lower back. He found no muscle spasms, full range of motion and no neurological deficits of the lower extremities. Dr. Zeringue opined that Virgil had reached maximum benefit from the medical care and discharged him to return to work. He indicated that Virgil's prognosis was good and he would continue to improve. At this time, Dr. Zeringue concluded that Virgil should not have any residual impairment nor functional disability as a result of the accident of December 7, 1982.
While being treated by Dr. Zeringue, Virgil was also seen by Dr. J. Monroe Laborde, an orthopedic surgeon, on January 24, 1983 and on April 22, 1983.
January 24, 1983  X-rays taken by Dr. Laborde revealed a right thoracolumbar scoliosis, but was otherwise normal. The doctor's diagnosis was lumbar myositis by history with no objective physical impairment and no orthopedic contraindications to returning to work. The doctor recommended additional X-rays of the thoracolumbar spine in order to define the scoliosis, but these were not done. The doctor also said "if the patient is given the benefit of the doubt he could be given symptomatic treatment such as cortisone injection, medication and physical therapy. I think he will recover completely with time".
April 22, 1983  This was a second examination by Dr. Laborde with Virgil complaining of low back pain, occasional mild pain in the left leg and numbness, but without weakness or incontinence. The doctor's impression was "that this patient has low *47 back pain by history superimposed on preexisting scoliosis. He has no objective physical impairment. I recommend that he take an anti-inflamatory agent and use a Back Owner's Manual for exercises." He was given a prescription for Naprosyn and advised to return for work April 25, 1983.
July 25, 1983  Virgil also visited Charity Hospital in New Orleans and he was seen by Dr. G. Collins, an intern in orthopedic surgery. Dr. Collins found Virgil's physical exam was within normal limits. However, Dr. Collin's assessment was lower back pain, with possible herniated nucleus pulposus with the plaintiff being given medication of Motrin; instructions to lie flat on his back with his knee bent when possible; physical therapy for back exercises; back brace (with a notation that patient had one) and instructions to return to the clinic in one month or as needed.
September 8, 1983  Virgil was seen at Charity Hospital by Dr. Jameson, a resident in orthopedic surgery. The physical examination was essentially normal.
September 12, 1983  Virgil was again examined at Charity Hospital with complaints of pain in the lower back radiating into the left post thigh and leg. He was recorded as feeling his pain as increasing and desired relief being amenable to surgery if necessary. He was also recorded as wearing a brace without relief. The physical examination records Virgil as being anxious, uncomfortable and in acute distress. This examination was by Dr. William D. Jameson who recorded his impression, "Rule out disc disease: and planned to admit Virgil for myelogram. The hospital records reveal that on September 19, 1983, Dr. Jameson again saw plaintiff and again directed that he be admitted for myelogram.
September 27, 1983  On this date Virgil was admitted to Charity Hospital and underwent a lumbar myelogram. Dr. Robinson, the radiologist reported anterior indentation on the subarachnoid space at the Level of the L-4 and L-5  S-1 intervertebral discs. There is no deformity of the lumbar nerve roots and root sleeves. CT scan was requested following the myelogram".
September 29, 1983  A CT scan of the lumbar spine was done on plaintiff at Charity Hospital and the report concluded "moderate concentric disc bulging without definite spinal canal stenosis at the L-4  5 and L-5  S-1 disc levels. There is no definite disc herniation seen in the present scan".
Dr. Numaguchi, a neuroradiologist at the Tulane Medical School, reviewed the lumbar myelogram and some of the lumbar CT Scans and interpreted the lumbar myelogram and the CT Scans as normal.
October 6, 1983  Dr. Jameson discharged Virgil from Charity Hospital and recorded that Virgil was given further low back exercises, fitted with a lumbo-sacral corset and asked to return to the clinic for follow-up. Virgil did not return to Charity Hospital.
December 7, 1983  Virgil was examined by orthopedist Mark Juneau, Jr., with complaints of low back pain that occasionally rediated into the left leg in the region of the posterior thigh and occasionally into the calf and ankle. He also reported occasional pain in the planter aspect of his foot. The doctor noted that Virgil was tender to palpation over the sacrum; but reported he could find no objective findings. He was of the opinion there was no objective evidence of herniated nucleus pulposus or peripheral nerve injury and stated that Virgil could return to work.
On June 13, 1984, Dr. A.G. Kleinschmidt, Jr., an orthopedic surgeon, saw Larry Virgil at the request of the court. Dr. Kleinschmidt found no objective signs of injury and determined that Larry Virgil had no partial permanent physical impairment and was capable of returning to the same work.
At the time of trial Virgil was 28 years of age and had worked for Scaffolding Rental nine months when the accident occurred.
Virgil testified that his lower back injury happened while he was stacking large scaffolding boards. He stated that he could not stand up straight and the accident was *48 immediately reported to his employer. He also denied having any prior back problems and there was no evidence to the contrary presented.
Virgil testified that he has been unable to return to work due to his back pain and as a result lives with his mother who aids and assists in his support.
Mrs. Jesse Virgil (Virgil's mother) testified that her son lives with her and that he continuously complains of back and leg pain. He also testified that he takes aspirin for his pain and regularly wears his back brace.
The law applicable in this case provides that once a worker is found, at the time of trial, to have a permanent, though non-disabling, residual physical impairment, he is entitled to reasonable compensation for 100 weeks, LSA-R.S. 23:1221(4)(p). If the worker is found to have a partial permanent disability, he is entitled to a percentage of scheduled disability for 450 weeks, LSA-R.S. 23:1221(3). A temporary total disability entitles the worker to a percentage of scheduled disability for the period of the disability, LSA-R.S. 23:1221(1).[1]
Counsel for American argues that the law and evidence do not support the judgment of the trial court awarding Virgil 100 weeks of compensation, in that, none of the medical evidence indicates that Virgil has sustained permanent impairment under LSA-R.S. 23:1221(4)(p), or that he was unable to return to the same work done prior to his injury when discharged from medical care by Dr. Zeringue on May 19, 1983.
Virgil's counsel, in response, not only maintains that the evidence overwhelmingly supports the trial court's finding, but also seeks to have the trial court's finding amended to either an award for permanent disability, LSA-R.S. 23:1221(2), (3), or temporary disability, LSA-R.S. 23:1221(1).
After hearing a Motion For New Trial, the trial court reasoned that Virgil was entitled to compensation benefits and in his oral reasons specifically indicated that he believed and was convinced that the plaintiff had suffered an injury for which he was entitled to 100 weeks of compensation. The trial judge apparently found that Virgil had sustained a permanent impairment under LSA-R.S. 23:1221(4)(p).
Upon our review of the record, we find the evidence clear that on December 7, 1982 Virgil suffered a temporary back sprain for which he was treated until May 19, 1983 when he was discharged to return to work. We find no objective medical evidence to substantiate Virgil's subjective complaint of residual back pain past this date.
Counsel for Virgil relies in support of his position on Ventress v. Danel-Ryder, Inc., 225 So.2d 765 (La.App. 3 Cir.1969), a case in which the employee's recurrent back soreness was found to entitle him to an award for permanent impairment under LSA-R.S. 23:1221(4)(p). This case can, however, be distinguished from the case before us. In Ventress, the medical evidence substantiated the employee's complaint of recurrent back pain, whereas, here, despite numerous and thorough examinations, not one physician, including a court appointed orthopedic surgeon, found any medical basis to substantiate Virgil's subjective complaints of back pain. The consensus of medical opinion is clear, that on December 7, 1982 Virgil sustained a temporary back sprain, and that by May 19, 1983 there was no medical contradiction to prevent Virgil from returning to the same work as done prior to his injury.
For the foregoing reasons we reject the plaintiff's claim for further worker's compensation benefits. We also amend the judgment to award worker's compensation benefits from date of injury until May 19, 1983 the date of the plaintiff's medical discharge to return to work.
All costs of this appeal are assessed to the plaintiff-appellee.
*49 AMENDED, AND AS AMENDED, AFFIRMED.
DUFRESNE, J., concurs.
DUFRESNE, Judge, concurring.
I concur in the results.
NOTES
[1] The law applicable in a worker's compensation case is the law in effect at the time of the injury. Olson Insurance Co. of State of Pa., 471 So 2d 1151 (La.App. 3 Cir.1985). See the 1983 amendments (effective July 1, 1983) to the worker's compensation statutes which amended the statutes discussed in this case.